## YOPP *v.* THE STATE.

There being no evidence to authorize a finding by the jury that the deceased assaulted the accused in order to prevent him from committing adultery with the wife of the deceased, it was error for the court, in its charge to the jury, to give the State the benefit of the law applicable to such a theory.

Argued October 19,—Decided November 21, 1908.

Indictment for murder.   Before Judge Martin.   Laurens superior court.   June 23, 1908.

George Yopp was indicted for murder, charged with the killing of Dock Cason.   Upon the trial it appeared that there were only two witnesses to the homicide, Nat Jones and Neily Cason, wife of the deceased.   The State introduced Nat Jones, who gave the following account of the tragedy:   Cason and his wife had separated about two months previously, and she had gone to live in a house belonging to her father.   Witness was her nephew and lived with her.   About eight o'clock at night witness and Dock Cason met at the back door of the house occupied by Cason's wife, and, in the language of the witness, "Dock asked me was Aunt Neily there, and I told him I did not know; nobody would answer, and he said, 'Let me see if I can make them hear.' I shook the back door first, and nobody answered; then he did, and nobody answered. There wasn't but two rooms in the house. Dock went around to the window and raised it up, and called me. He told me to come around there. I held it up for him and then he did for me afterwards and let me into the room where George and Neily were. George was sitting on the side of the bed and Neily in a chair by the fireplace. Aunt Neily said, 'Dock, what do you want to come in here for? Don't you know Papa don't allow you

to come in his house?' He said, 'Don't be so fretful. I am not going to hurt the house.' Dock said, 'Hello George,' and George said something to him. George said 'Hello,' and Dock said, 'Have you got a pistol or a knife?' And George said, 'No, I haven't got either one.' George said, 'Dock, didn't we settle this thing Tuesday night?' and Dock said, 'I didn't come here to have any fuss at all; and if you haven't got a pistol or a knife, get up and let's have some fun. . . George sat there with his head down, and seemed like Dock was going back to shoot him. And he walked around the table and Dock backed and George shot him. He walked back about three feet. He had his hand in his hip pocket. He backed back and stood still. Dock at that time said nothing. George shot him twice. I don't know where he got the pistol. He hit him once, and Dock fell in the door cat-a-cornered. . . George said, after shooting, 'The damn son of a bitch, I have killed him.' Dock said nothing after he was shot. He was killed dead. I didn't see Dock with anything. I didn't have time to look at him pull his hand out of his pocket, I didn't see anything in his hand. . . George left, I didn't know where. he went. I run out of the house. . . I reckon I was gone about an hour, . . and when I got back I saw the knife down there by his right hand, I reckon about two feet from his hand." On cross-examination, the witness testified: "I called Aunt Neily, and nobody would answer. George and Aunt Neily were both in the kitchen. . . They were doing nothing but talking. George was on the bed, and Neily was in the chair. I don't know what they were talking about." After detailing the conversation between Dock and George, as testified to on his direct examination, the witness further testified as follows: "George said, 'Didn't we settle this thing up town Saturday night?' He said 'Yes,' and George said, 'What do you want to come here starting another fuss for?' and he said, 'I didn't come for any fuss,' and George said, 'You act like it,' and Dock said, 'If you haven't a pistol or a knife, get up,' and George walked around the table and looked like he was going to shoot. They were both backing back. There was a door to this room, at the end, barred up. I reckon the door in front was fastened. He went out of the back door. I reckon when he got up he started around the table like he was going through the middle door out to the front. He went towards the

door. The shooting occurred before he got there. When he left the bed he went toward the middle door. He had to go around the table. Dock asked him before he started if he had his pistol or knife." A witness for the State testified that he reached the scene of the homicide soon after the killing, and that a knife was lying near the left hand of Dock Cason. There was also evidence for the State to the effect that the knife found near the body of Dock Cason belonged to his wife, Neily.

Neily Cason testified, in behalf of the accused, as follows: "I . . was present the night that Dock was shot. I was living then with my father. . . Dock came to my house about 11 or a little bit later, and George Yopp was there. He came to the front door and knocked, he came from the front door to the back door, and when he knocked at the front door I locked the back door, and he 'histed' the window and came in, and I asked him didn't he know he had done wrong by coming in the window, and he said yes. I told him my father said if he couldn't live with me like a husband he would rather he didn't come to my house. He asked George did he have a pistol, and George told him no, and I asked him to listen to me, and he would not. He asked George did he have a knife, and George told him no, and George asked him hadn't they drank and shook hands up town, and I asked Dock again to listen to me, and I told George not to say anything to him and to go on, and I told Nat to go to the store and tell my father to come there, and Dock told him he need not mind going for my father, and I asked him again to listen to me, and he turned to George and asked him did he have a pistol, and George told him no, and he stepped a few steps backward and took his knife and stepped a few steps forward and said, 'Get up and let's have some fun.' He said he come there for business, and to get up, and George rose and shot him. Dock was going towards George when he shot him and had got pretty close. . . There was a table in the rear of George, that kept him from getting out of the way when he was going on him with a knife. Dock could not have gone through the wall. He was hemmed up like. Dock had the knife in a cutting position. He drew it from his hip pocket. It was open when he drew it out. I don't know where this knife came from." The witness testified that it was not her knife. She further testified that George came to see her occasionally, but there had

never been any improper intimacy between them, that neither of them had had any clothes off on the night of the homicide, and she had not been on the bed at all that night. There was evidence for the accused tending to show that the knife found near the body of Dock Cason was his knife. A witness for the State testified, in rebuttal, as follows: "I went by the house where Dock Cason was killed that night, somewhere between eleven and twelve o'clock, and heard something said by somebody in the house. I was passing by, and heard a knocking on the inside of the house, and I stopped a few minutes and I heard a voice that seemed like it was in the lower room, said, 'Open the door,' and no one didn't say anything at that time, but I could hear a mumbling in the front room, and they knocked again several times, and after a while I heard a fellow speak and say, 'You are not going to open that damned door,' and the other one said, 'Open the door, George, I am not going to hurt you,' and he [the defendant] said, 'I know damn good you are not going to hurt old George; wait till I can get my pants on, and I will open the door,' and I went to get another fellow to come there and stop the row."

There was a verdict finding the accused guilty, with a recommendation to mercy. He made a motion for a new trial, which was overruled, and he excepted. From this motion it appears that upon the trial the court charged the jury as follows: "One of the contentions of the State in this case is, that Dock Cason, if he did make an assault upon the defendant, George Yopp, he did so under such circumstances that he was justifiable in making the assault upon Yopp, and that Yopp is not and could not under the law be justifiable in defending himself against such an assault, the State claiming that Dock Cason made the assault upon Yopp to prevent Yopp from debauching or having illicit intercourse with the wife of Dock Cason. This contention is controverted and denied by the defendant; and that constitutes an issue of fact which the jury are to pass upon and determine. I charge you that it is only where there is an absolute necessity on the part of the husband to make a deadly assault to prevent adultery with his wife, that the case would stand upon the same footing of reason and justice with other cases of justifiable assault; that is, that Dock Cason would only be justifiable in making an assault upon Yopp that was necessary to prevent an illicit intercourse or adultery or

apparently so to him as a reasonable man under the facts and circumstances existing at the time. If you believe that he, Cason, made an assault and was justifiable in making this assault upon Yopp, then I charge you that Yopp would not be justifiable in repelling that assault by making a counter deadly attack or assault upon Cason; that is, if you believe from the evidence in this case that Dock Cason assaulted Yopp under circumstances where there was an urgent and pressing danger of Yopp's committing adultery or illicit intercourse with the wife of Cason, if you find the woman alleged to be so was the wife of Cason, and that assault was absolutely necessary to prevent the adultery, then Yopp would not have been justifiable in making an assault. And if you find that to be the facts of the case, and that Yopp was in the act or about to commit the act of adultery with the wife of Cason, and this assault was made to prevent it, I charge you then that although Yopp himself being in danger would have no right to defend himself by using any deadly weapon against Cason, the law being that what would justify the husband under such circumstances would not justify the adulterer in preventing by homicide or attempting homicide." These instructions were made the subject of several grounds for the motion for a new trial. Among the assignments of error were, that the evidence did not make any such issue as stated by the court in these instructions, and that the charge was not authorized by the evidence.

*D. M. Roberts* and *H. P. Howard,* for plaintiff in error.

*John. C. Hart, attorney-general,* and *Joseph E. Pottle, solicitor-general,* contra.

FISH, C. J. (After stating the facts.) The instructions of the court, quoted in the statement of facts, were subject to the noted assignments of error thereon, made in the motion for a new trial. It is plain that these instructions were not authorized by the evidence. The jury could not find from the evidence that Cason, if he assaulted the accused with a deadly weapon, was justified in so doing because the accused was in the act of adultery with Cason's wife, or that the assault was made upon the accused to prevent him from committing adultery with the wife of Cason. Whatever may have occurred before Cason entered the room where his wife and Yopp were, or whatever may have been the intention of Yopp and Cason's wife before Cason came into the room, it is clearly

evident from the testimony that Cason did not come upon his wife and Yopp while they were committing the act of adultery, or find them in such a situation relatively to each other as to indicate that such act would then be committed unless he, Cason, interfered by violence to prevent it. According to the testimony of both Nat Jones, who was introduced by the State, and Neily Cason, wife of the deceased, who testified in behalf of the accused, when Dock Cason entered the room where his wife and Yopp were, Yopp was sitting on the side of the bed and Cason's wife was not on or at the bed, but, if Jones was to be believed, she was sitting in a chair by the fireplace; and if her evidence was accepted as true, she was then going from this chair, from which she had just arisen, to the back door to open it for Cason to enter the house. But, even granting that the law which the court charged would have been applicable to the facts if Cason, as soon as he had entered the room, had made an attack upon Yopp, it is clear that such law was not applicable to the case when the evidence, both for the State and the accused, showed that Cason did not assault Yopp immediately upon entering the room and finding him and Cason's wife therein, but engaged in a conversation with him, one purpose of which appears to have been to ascertain whether Yopp was armed or not. So, if Cason assaulted Yopp at all, such assault was not made immediately after an act of adultery had been committed by Yopp and Cason's wife, nor at a time when the commission of such an act by them was imminent. No reasonable mind could conclude that Yopp intended to have sexual intercourse with Cason's wife while both Cason and his wife's nephew were present in the room. It is clear, therefore, that whether Cason made an asault upon the accused to prevent him from debauching or having illicit intercourse with Cason's wife was not an issue made by the evidence in the case; and the charge of the court, in which it was stated that this was an issue, and the instructions to the jury as to the law applicable thereto, were calculated to mislead the jury and to harmfully affect the rights of the accused, and consequently were cause for a new trial. *Judgment reversed. All the Justices concur.*